Eric Skonberg 3/17/2006

90

A. If I was to take a pressure measurement in this hole or this hole, both at minus 50, I would expect the pressures to be similar.

Q. Now, what I'm asking you about, then, is that where we have groundwater on the shore, we don't have any hydrostatic head there, do we?

A. Yes.

Q. But it's not contributed to by the ocean.

A. Yes.

Q. It is contributed --

A. I'm sorry. I --

Q. You agree with the premise that --

A. There is hydrostatic head and that hydrostatic head would be basically the elevation of the groundwater above it and it's not contributed by the ocean.

Q. And as a general principle, the hydrostatic head of the ocean water, if it's greater than the hydrostatic head of the groundwater, that hydrostatic head of the ocean water would retard the flow of fresh water out under the sea floor, correct?

A. I believe I've already answered that.

Q. But I'm ignorant and I'm not sure. So

Eric Skonberg 3/17/2006

91

tell me what your answer is.  Yes or no?

A.    Then can you repeat the question?

Q.    If the hydrostatic head of the seawater produced down through the ground is greater than whatever hydrostatic head is produced by the fresh water, the seawater will retard the flow of fresh water out into the sea floor, correct?

A.    Or further underground.  I don't know where it will go, but it would not allow the groundwater to flow out.

Q.    Under the sea floor.  Out means under the sea floor.

A.    Push it down.  Everything's under the sea floor.  That's why I'm...

Q.    The fresh water -- if the fresh water is of less hydrostatic head than the ocean water, then the fresh water will stay on its side and will not migrate out under the sea floor, correct?

A.    It will not elevate to the sea floor.

Q.    All right.  And when you say elevate --

A.    The head is a function of the depth and so it would not -- there's less head at half the depth and so it would not rise to that.

Q.    But for the fresh water to migrate out under the ocean floor, doesn't it also have to

Eric Skonberg 3/17/2006

92

overcome the hydrostatic head produced by the seawater?

A.    The seawater that's in the groundwater?

Q.    That's above the ground level.

A.    For it to go into the sea floor?

Q.    Yes.

A.    I really think we're -- I'm not sure if we're communicating and I just -- let's start over with that question.

Q.    The hydrostatic head under the sea floor is affected by the depth of the ocean above it, correct?

A.    And it's affected by the depth that it's taken at.  Let me try -- and this is just part of the communication.

If -- I can pick an elevation.  At minus 50, okay, coming all the way across, right?

Q.    Yep.

A.    Here you have 20 to 25 feet of seawater above it.  And you have 25 to 30 feet of what I would anticipate groundwater.  There's water in the ground.

At this point we have --

Q.    "This point," being OF-1?

A.    Yeah, OF-1.

Eric Skonberg 3/17/2006

93

We have less than -- let's say approximately 5 feet of seawater and then to the minus 50 approximately 45 feet of the water that's in the ground.

I would anticipate the pressure in the bore hole at elevation minus 50 to be approximately the same at both.

And I believe your question was -- and I'm not trying to argue; I'm going through this to understand -- you say it's affected by the height of the seawater above it. And here we have more seawater. And if I answered that question, then I would expect higher pressure here. I would say it's the overall depth under the ocean surface.

Q. Okay. So you go from ocean surface down to depth and you get -- your pressures are measured that same way no matter what.

A. I would say I would expect the pressures to be similar.

Q. All right. But we have a calculable pressure created by the seawater at the location -- at any point under the sea floor, correct?

A. Assuming that it's a permeable formation.

Eric Skonberg 3/17/2006

94

Q. Okay. But we've agreed this is a permeable formation.

A. I've stated that's my assumption. I don't know if we agree.

Q. All right. Now, let's get away from the ocean. We've stepped out of the ocean; we're now on land.

A. Uh-huh.

Q. There's water under the ground under the land.

A. Yes.

Q. We don't have the ocean surface creating a head on the groundwater, do we?

A. No.

Q. And the groundwater has a head that is equivalent to the depth of the groundwater to the depth you've measured.

A. Approximately, that's right.

Q. And the ocean pressure creates a barrier to the fresh water flowing out into the sea floor, correct?

A. Well, I don't necessarily -- when we say fresh water, I would rather just call it groundwater, the water that's in the ground.

Q. Groundwater. Okay. It may be brackish,

Eric Skonberg 3/17/2006

95

whatever.  But the water that's in the ground not under the sea floor is under a different pressure than the water in the ground that is under the sea floor, correct?

A.    I would expect at this location if we took a measurement of the pressure at minus 50 on Bore Hole 4 --

Q.    Which is on the ground?

A.    Yeah, which was taken on shore.

-- to be approximately the same as an elevation of minus 50 offshore.

Q.    For what reason?

A.    Because I would -- and we can look at the exact motions, but, generally, the groundwater in coastal areas will follow the elevation of the seawater.

Q.    Ocean, okay.

A.    Sea level.

Q.    All right.

A.    And the sea level, of course, will change.  Not drastically, but it does change.

Q.    All right.  Now, for the groundwater not under the ocean, it is not going to migrate under the ocean unless it's of a greater pressure than the water under the ocean, correct?

Eric Skonberg 3/17/2006

96

A.   Than the groundwater under the ocean, yes.

Q.   Correct?

A.   Correct.

Q.   So for the groundwater -- for the water on the ground side to get out to the ocean side, the groundwater on the ground side has to be of a higher pressure than the water on the ocean side.

A.   I agree with that.

MR. BROWN:  All right.  Do you have any preference on when you break for lunch?

THE WITNESS:  It's up to you, except I could use a five-minute break.

MR. BROWN:  All right.  Let's take a quick break.

(A brief recess was held.)

BY MR. BROWN:

Q.   What were the purposes -- tell me what you were trying to illustrate by the preparation of this chart.

What are the significant facts that you want to tell us about by doing this visually?

A.   I was trying to depict the design placement compared to the as-built placement.  I was trying to depict the known geotechnical

Eric Skonberg 3/17/2006

97

conditions as described in the tender documents and where they were in relation to both the design and the as-built.

I think those are the two major points.

In general, I just know that with HDD installation, something visual helps a lot of people.

Q. It does me.

Now, let me kind of run to the end. Do you agree with the premise that at some point in time a 64-inch hole existed with an entrance and exit point through which the pipe could have been pulled?

A. In my opinion?

Q. Yes, based on what you've read, is that a true statement?

A. In my opinion, at at least one point in time, Sunland had opened this hole to 64 inches and that the hole was in good enough shape to install the pipeline in.

Q. And it was your opinion that the pipeline could have been installed in that hole.

A. Yes, in my opinion.

Q. Well, what do we say about the radius or the radii -- the curve that was produced by Sunland

Eric Skonberg 3/17/2006

98

was, in your opinion, sufficient to pull a 54-inch-outside-diameter HDPE pipe through it successfully?

A.    I've not done those calculations.  The curve and the smaller radius would have caused additional pulling loads.  And I've not done those calculations.  But I believe that Sunland had sufficient rig capacity to pull it in.

Q.    Now, have you seen John Hair's calculations of the pulling loads on the 54-inch-outside-diameter pipe?

A.    Yes.

Q.    Do you take exception to those?

A.    Not that I recall.

Q.    Do you know Mr. Hair?

A.    Yes.

Q.    Do you consider him to be a competent HDD engineer?

A.    Yes.

Q.    Would you rely upon his conclusions?

A.    In general, yes.

Q.    Well, as we sit here today, is it your opinion that the hole actually drilled by Sunland was in some way inadequate to pull the HDPE pipe through?

Eric Skonberg 3/17/2006

99

A.    I'm saying that it was materially different than the hole modeled by John Hair for his calculations and it would have been more difficult to pull through the as-built hole.

Q.    The calculations that -- John Hair's calculations that you have seen, what radius were those calculations based on?

A.    I would like to refer to the documents, if I can, or I can go by my recollection.

Q.    All right.  Well, I would rather get the accurate answer.

A.    Okay.  If we can pull them out.  Do you know --

Q.    Let me ask you this:  In your opinion, can you pull HDPE pipe through a hole that has a radius of 600?

A.    It depends on the diameter and the wall thickness of the HDPE pipe.

Q.    This pipe, 54 inches, of the wall thickness that it was, could that pipe have been pulled through a hole with a radius of 600?

A.    It may have.  I've not done those calculations.

Q.    If John Hair has done them and concluded that it could have been, do you have any reason to

Eric Skonberg 3/17/2006

100

take exception to that?

A.    I would want to look at it.

Q.    Have you seen those calculations on a 600 radius?

A.    On a 600-foot radius?

Q.    Yes.

A.    I don't recall.  And I'm open to you presenting them to me.

Q.    Well, as we sit here -- and let me just tie up this end, because I want to make sure.  I know I'm asking things over, but I'm learning and it takes me a little while.

As we sit here today, are you saying, as a matter of your professional opinion, that the 54-inch-outside-diameter pipe that was in the ocean to be pulled could not have been pulled through the hole of the profile created by Sunland?

A.    I'm saying that I would have misgivings about it, that I've not performed those calculations.  And I think my misgivings would be the effect on the pipe material whether than they can pull it.

Q.    They had a pipe sufficient enough to pull it or tear it apart -- I mean -- excuse me -- a machine that would pull it or tear it apart,

Eric Skonberg 3/17/2006

101

correct?

A.    Correct.

Q.    Your question is whether the calculations show it's going to tear apart before it gets pulled through.

A.    Or would be usable afterwards.

Q.    Flatten out like a soda straw.

A.    I'd just have reservations.  I would want to look at it very closely.

Q.    Well, is a reservation, in your opinion, the equivalent of a professional opinion that most probably it will happen or do you consider those to be different?

A.    I have said that I have not performed those calculations.  And before I offer an opinion, as opposed to just having a reservation, I would want to do those calculations.

Q.    Well, you would not base engineering judgment on misgivings, would you, in the real world?  You would do calculations and come to a professional conclusion; would you not?

A.    I would say that there are times that I make decisions on misgivings, but I would prefer to have the time to justify them with calculations.

Q.    Well, as we sit here today, are you

Eric Skonberg 3/17/2006

102

saying that you are not yet prepared to give an opinion on whether or not the 54-inch-outside-diameter pipe could have been pulled successfully through this hole?

A.    As it relates to curvature.

Q.    As it relates to any factor existing in the hole you believe was created.

A.    Okay.  I believe that at at least one point in the project that the hole was sufficiently stable to install a pipe in it.  I am not here to give an opinion today of how that -- the excessive -- how the reduced radius would have affected the pipe material.

Q.    Is it possible that that radius would not have affected the pipe material and you could have pulled it and had a functional pipe?

A.    It would have affected it.  It is possible that you could have had a functional pipe. It would have increased the stress and the load.

Q.    But you cannot tell me that that increased stress and load would have produced an unusable pipe.

A.    I cannot tell you that today.

Q.    All right.  What would you have to do to tell me that?

Eric Skonberg 3/17/2006

103

A.    I would have to undertake calculations that would be similar to what Mr. Hair did.

Q.    Based on your experience with Mr. Hair, is he capable of doing that calculation?

A.    Yes.

Q.    All right.  Let's break for lunch and we'll come back.

THE WITNESS:  Okay.

MR. BROWN:  An hour?

MR. SMITH:  Sounds good.

(The lunch recess was held.)

BY MR. BROWN:

Q.    One of the issues in this case is whether there was water under -- groundwater under pressure sufficient to interfere with the performance of the work.  Is that a fair way to state it?

A.    That's what my understanding is, yes.

Q.    Have you reviewed the information to arrive at an opinion on whether or not that is a correct or an incorrect assumption?

A.    An assumption of it being a matter in this case or whether or not it actually happened.

Q.    Whether or not it actually happened.

A.    I haven't seen enough evidence to

Eric Skonberg 3/17/2006

104

convince me that it did happen.

Q. All right. Have you seen evidence that it did happen?

A. The only evidence -- well, the major evidence that I saw that it happened was the report of the diver.

Q. Okay. Now, do you believe the diver was wrong in the conclusions he drew about the conditions he encountered on the sea floor?

A. I think he very well could have been wrong.

Q. Well, let me go back to your distinction between misgivings and professional judgment.

Do you consider yourself qualified to offer an opinion on the sea floor conditions over and above or contrary to what the diver expressed an opinion about? Are you qualified to evaluate the conditions on the sea floor?

A. On that day?

Q. Yes.

A. No, but I have managed work based on divers' descriptions and I've had many experiences where two divers describe an event two different ways. But I'm not in a position to -- I wasn't there.

Eric Skonberg 3/17/2006

105

Q.    Okay.  Well, let's assume that I put on a hard hat and went down there and was standing beside the diver.

In terms of who is the most credible person to offer an opinion over what was happening, would you believe I was more credible or the diver was more credible?

A.    I think both of you would have the same credibility that there's something pushing you.  As to why the water is flowing, I don't know who would be more -- I don't know if this diver, for instance, ever worked on another HDD project.

Q.    Well, assume this diver has ten or more years of experience working on the sea floor.

A.    But not with HDD.

Q.    Whatever it is, working on the sea floor.

A.    Okay.

Q.    Do you believe you are more qualified than the diver to interpret the conditions that he's encountered on the sea floor?

A.    I think that he's more qualified to interpret the conditions.  He may or may not be qualified to interpret what's causing the conditions.

Eric Skonberg 3/17/2006

106

Q.    Why?

A.    That would come back to has he worked around an HDD drill hole, has he worked in the open ocean with tidal currents, has he worked near excavations on the sea floor.  I don't know.

Q.    Well, are your concerns about the diver's correct interpretation misgivings or do you believe you know enough and have the qualifications to offer an opinion that he is, in fact, wrong?

A.    I can offer an opinion as to other things that it may have been based on my experience with divers.

Q.    But are you in a position to say that the diver is wrong and you are right or are you just saying there are other possibilities?

A.    I'm saying there are other possibilities.

Q.    Would you agree with me that you do not have the qualifications to overrule the diver insofar as matters within his expertise?

A.    Within his expertise.

Q.    Do you have any data on what was going on on the sea floor on that day other than the tidal information you've produced?

A.    No.

Eric Skonberg 3/17/2006

107

Q.    Have you checked any currents in that area?

A.    In that area, no.  I believe I did -- I tried to look for it, but I don't recall finding any information.

Q.    Is it possible the diver was right?

A.    I think it's possible.

Q.    Now, you say that you have not seen enough evidence to convince you that it existed.

Have you seen any evidence that suggests that it does not exist?

A.    It's -- proving a negative is more difficult.  If there had been pressurized groundwater, be it fresh water or saltwater, I think that you would have seen near continuous flow at the exit point offshore.

I think more than likely you would have seen flow into the entry pit and/or flow into the excavation that they had near the shoreline.

Q.    Those are all possibilities.

A.    That's what I would expect to see if there was a pressurized -- if there was pressurized groundwater.

Q.    Have you seen the Golder report?

A.    Yes.

Eric Skonberg 3/17/2006

108

Q.    Does it indicate that there is, in fact, water of a different salinity in the sea floor in the area of the drill path?

A.    That's what the report indicates.

Q.    Do you dispute that?

A.    I don't dispute it.  I'm not an expert in seismic and the electrical potential survey that they did.  I probably even have the wrong name, which shows my lack of expertise.

My experience with similar techniques and/or those techniques has been mixed in terms of accurately defining it.

There have been times that I thought it did a tremendous job.  There was other times that I thought it was ambiguous.

And I believe that your question was that I take exception with it?

Q.    Do you have the expertise to personally take exception to the report and say that it is wrong or even that it is right?

A.    Oh, I wouldn't -- no, I don't have that expertise.  I would have the expertise to put a degree of confidence into it based on my experience.

Q.    And what is your degree of confidence in

Eric Skonberg 3/17/2006

109

it?

A.    I've had mixed experiences with it.

Q.    Well, can you offer any degree of confidence in this specific Golder report other than you've had mixed experience with other reports?

A.    No.  I wasn't out there.  I didn't have a chance to see if they were doing the correct procedures.  I know of Golder; and as far as I know, they're a reputable company.

Q.    But you're not prepared to offer an opinion that the Golder report is deficient because of any error in their technique.

A.    No.

Q.    You're not in a position to offer an opinion on any error in the Golder report because they misread the data they collected.

A.    No, but that goes -- I don't have an opinion either way.

Q.    All right.  Now, the profile that you drew, it appears from your report that you're also using that profile to illustrate or depict problems in the drilling process as opposed to misgivings about the ability to pull the pipe.  Those are two different issues; aren't they?

Eric Skonberg 3/17/2006

110

A.    Would you restate it, please.

Q.    I read your report to discuss two different considerations in relation to the profile of the pipe.  Or the profile of the pilot pole.

One, you said, was a misgiving but you had not determined whether that misgiving was accurate about the ability to pull the HDPE pipe.

A.    Due to the curvature of the hole, yes.

Q.    Now, as a separate matter, you have talked about the curvature of the hole in relation to the difficulty of actually creating the hole.

A.    Yes.

Q.    To me -- it seems to me those are two different things.

A.    Caused by the same condition in the hole.

Q.    Yeah, all right.

A.    Yes.

Q.    And you have used data regarding 30-foot sections to determine individual radii --

Is it radii or radiuses?

A.    Radii.

Q.    Radii.

-- individual radii at different points along the path.

Eric Skonberg 3/17/2006

111

A.     Yes, different degrees of curvature.

Q.     Now, the fact that you have different degrees of curvature is not uncommon?

A.     In an HDD hole?

Q.     Yes.

A.     No, that's not uncommon.

Q.     It would be a pretty good operator to create a perfect curve within a thousand feet; wouldn't it?

A.     It would be a good operator that would do that.

Q.     Now, do you know who the operator of this drilling exercise was?

A.     The actual driller?

Q.     Yes.

A.     No.

Q.     Do you know the company?

A.     Sunland.

Q.     Do you know who they were using to do the -- to pilot or direct the hole?

A.     Well, it would be my understanding -- and I'm open to correction here because I don't believe I saw it in the literature that I looked at -- the Sunland operator -- the Sunland -- a Sunland employee would have been the

Eric Skonberg 3/17/2006

112

man turning the drill pipe directing the hole.

Q.   Do you know who John English is?

A.   Yes.

Q.   Who is he?

A.   He's with Horizontal Technology, Inc.

Q.   Is that a reputable company?

A.   Yes.

Q.   Would you hire them to manage this project?

A.   To manage it?

Q.   To run the drill path.

A.   I would hire them to run the tool that gives me the data to drill the path -- not me personally but whatever company I was representing.

Q.   But you'd have no flaw or problem with them being the person who was directing the cutting head to run the drill path.

A.   I'm not sure that they were.

Q.   Okay.  If they were involved in this project and had a relationship to creating the pilot hole, would you believe that's an appropriate choice for Sunland?

A.   Yes.

Q.   Now, explain your understanding of how this pilot hole goes.  There's an operator, someone

Eric Skonberg 3/17/2006

113

that's directing the cutting head?

A.    Someone that's operating the drill machine, the rig itself.

Q.    And is there a separate person who is reading the feedback from the drilling head?

A.    Yes.  He's operating the electronics that give you the data that tells you where you are.

Q.    Do you have an understanding of who specifically were performing those tasks on this project?

A.    Not that I recall.  It may be in the HTI reports.  I've looked at them since this report.  I don't recall.  I'm sure they have a name, an operator's name up there.

Q.    But you have looked at John English's company's reports in relation to this drill path.

A.    Yes, briefly.  That was after this report.

Q.    Okay.  Well, let me just ask you to go to your report, I guess Exhibit 98.  In your report beginning at Page 7, that's where you discuss the curvature of the pilot hole.

A.    Yeah.

Q.    Now, this is the pilot hole itself, is

Eric Skonberg 3/17/2006

114

what we're talking about.

A.    Yes.

Q.    And what's the approximate diameter of that hole?

A.    I would say nine to twelve inches.  It may be -- I don't recall exactly what this one was.

Q.    Would you expect that the process of reaming out the hole to 64 inches would at least mitigate some of the eccentricities created at the pilot hole?

A.    I wouldn't call it -- eccentric from an engineering term is not peculiar.  Eccentric is not circular.

Q.    Okay.

A.    If I can rephrase it?

Q.    Yes.

A.    Reaming this out would make some of the curves less harsh.

Q.    Okay.  Fair enough.

A.    Would increase the minimum curvature.

Q.    Okay.  And as far as pulling the pipe, any difficulties in pulling the pipe that theoretically there are by virtue of the pilot hole data, would be mitigated somewhat as that hole is increased in size?

Eric Skonberg 3/17/2006

115

A.    It would be mitigated somewhat.

In terms of the radii that we discussed -- that I discussed in the report and that we're discussing -- this is going back to a generally accepted HDD method of interpreting the pilot hole data which uses data over three joints or 90 to 100 feet.

It's my opinion that the reason why the industry generally chooses that is because that would give you less severe curvature and it takes into account the reaming process.

Q.    Well, is it standard practice in the HDD industry to measure or evaluate the radii of the curve based on a 3 point -- 3 joint radius?

A.    In my experience, it is.

Q.    And is that an acceptable way to do it?

A.    In my opinion, it is.

Q.    In terms of determining the stress inflicted on the drilling pipe, is that the more appropriate determiner of stress as opposed to any one single joint?

A.    On the drill pipe --

Q.    Yes.

A.    -- or the product pipeline?

Q.    Drill pipe.

Eric Skonberg 3/17/2006

116

A.    The more accepted, according to the American Petroleum Institute, is to look at the curvature based on one survey after another, not over three joints.

Q.    Well, now, the Petroleum Institute is dealing with vertical drilling; isn't it?

A.    They're dealing with the drill pipe that HDD contractors use.

Q.    But aren't they dealing with the vertical drillings?

A.    They're dealing with that and they're dealing with a lot of the tools that we use.

Q.    But aren't there differences in terms of what you use and what is industry standard between HDD and oil well drilling?

A.    Not in terms of drill pipe.

Q.    You don't think there are?

A.    As far as I know, most -- as far as I know, contractors that are using a drill pipe are built to API standards.  The drill pipe is manufactured to API standards.

Q.    But in your opinion, is the stress in a horizontal drill imposed in the same fashion as a vertical drill?

A.    It depends on what part of the

Eric Skonberg 3/17/2006

117

operation.

Q.    And what part?

A.    Well, whether you're pushing on the pipe or pulling on the pipe.  But if you're pulling on the pipe, I would say that it's similar to -- most of the pipe in a vertical well is in tension.

Q.    It's pushed.

A.    No, it's being pulled.  It's suspended.  Okay.  Most of the pipe.  Not all of it.  Most of it.

Once you get to where you're pulling on the pipe, then the behavior is very similar to what you would see in an oil well.

Q.    In an oil well, are you pulling on the pipe or pushing it down?

A.    You're generally pulling on -- you're hanging the pipe.  And so the pipe is in tension.  It's beng pulled apart.

Q.    But the pipe is going down away from the surface.

A.    Yes.

Q.    The pipe is going away from the drilling rig.

A.    That's right.

Q.    In HDD the pipe is being pulled toward

Eric Skonberg 3/17/2006

118

the drilling rig.

A.    That's right.

Q.    But in your opinion the stresses are calculated the same way.

A.    When they are tensile stresses, yes.

Q.    Is it also appropriate to measure the stress in the drilling pipe based on a 3 joint radius as opposed to a 1 joint radius?  Is that an accepted technique?

A.    In the HDD industry?

Q.    Yes.

A.    I'm not sure that I have seen that before.

Well, I don't want to say --

I've seen the curvature of a hole expressed over 3 joints.  This is a very technical answer.  But I have seen it expressed over 3 joints, although it was measured over adjacent joints.  But it didn't turn into a stress calculation.  It was an analysis of curvature.

Q.    Well, what you're talking about is that when the pipe is curved, there are additional stresses imposed on the pipe at the same torque than if the pipe is in a straight line.

A.    Yes.

Eric Skonberg 3/17/2006

119

Q.   We're not creating torque by curving the pipe; we're putting more stress on the pipe at the same torque, correct?

A.   It would increase -- even with a theoretical model, if you were to bend it, you would have to push on it somewhere, right?  And if you do that, then the torque will increase, unless you are modeling it with no friction at that point.

Q.   But the increase in -- the principal factor, in terms of the curve pipe, is that the stresses at the same torque are increased but maybe some additional torque is also added.  Is that a fair way to say it?

A.   Well, stress is different than torque.

Q.   I understand.

A.   Stress is the result of torque.  And if you're simply rotating a cylinder, you will have certain stresses, okay?  And they're all in one plane.  Well, and you're not pulling on it.  If you bend it, you will get additional stresses, cyclical stresses.

Q.   But basically the same torque.

A.   In practice, no.

Q.   The reading you're getting, the torque reading you're getting, is basically the same if

Eric Skonberg 3/17/2006

120

all you've done is increased the curvature of the pipe; is that fair?

A.   No.  I don't agree with that.

Q.   How much torque do you add by increasing the curvature of the pipe?

A.   It increases it.  I can't tell you off the top of my head.  It depends on -- most of the factor depends on how hard they're pulling.  The harder that they're having to pull, the harder it's pushing into the wall of the hole.  And so that increases the torque.

Q.   Also, the hardness of the material they're cutting into increases the torque, correct?

A.   In principle, yes.

Q.   Because you have to pull harder; or it has to stay against it longer.

A.   I think I understand what you're saying, but it's not -- because it's taking more force to remove more material -- or more force to remove the material -- that force over the arm to the center of the drill pipe, if you increase the force, then you increase the torque with the same arm.

Q.   Well, if we're talking about an increase in torque, isn't the principal factor creating that the difficulty of the material you're drilling into

Eric Skonberg 3/17/2006

121

than how hard you're pulling on the pipe?

A.    That's one of the factors.

Q.    Wouldn't that produce more torque than in the curvature of the pipe?

A.    It could in certain circumstances.  A big factor is what -- how hard are you pulling.

Q.    Okay.  But that's not associated with the curvature of the pipe.

A.    The curvature of the pipe or the curvature of the hole?

Q.    Well, the curvature of the pipe, if I understand your position, is that it is a function of the curvature of the hole.

A.    Okay.

Q.    Correct?

A.    Yes.

Q.    And where you have these excessive radii, we'll call it, you're increasing the curvature of the pipe.

A.    Yes.  And just -- because it does get confusing.  If we call it excessive radii, it's actually a lower number.

Q.    I understand.

A.    Okay.  If there's excessive curvature but a lower radius.

Eric Skonberg 3/17/2006

122

Q.   When I say excessive, I mean it's imposing more --

A.   I just want to be clear.

Q.   All right.  Lower number increases the curvature.

A.   Yes.

Q.   So a lower radii, the curvature of the pipe, in your opinion, with everything else being identical, will produce a little bit more torque.

A.   It will produce more torque.

Q.   But if we then pull harder on the pipe, we're producing more torque.

A.   Due to the curvature.

Q.   Well, if I'm in a straight line --

A.   If you're in a straight line -- I'm sorry.  I will let you finish.

Q.   If I'm in a straight line and I'm reading X torque and I increase the pulling on the pipe, I'm going to get higher torque.

A.   Based on your description, I would not expect higher torque.

Q.   If I am into harder material, would you see higher torque?

A.   If all of that increased pull force is going to the face of the cutter, I would expect

Eric Skonberg 3/17/2006

123

higher torque.

Q.    Where else would it go?

A.    To whatever is behind it, whatever you're pulling along behind it.

Q.    Well, some of it is going to the drill face to create a bigger cutting force.

A.    Yes.  I agree with that.

Q.    And an increase in torque can indicate a higher pulling force against a harder material.

A.    It can indicate a higher pull force against harder material?  It could.

Q.    All right.  Now, on Page 7 of your report, you have a 3 joint radius in graph.  My copy is black and white.  I don't know if we've got a colored copy around.  Or was your original black and white?

A.    No, the original was in color.

MR. BROWN:  Where is the original?  Can you get the original?

MR. SMITH:  Not easily.  I don't know where one is as far as the original.

MR. BROWN:  Why are you making my life hard?

MR. SMITH:  You can read mine a little bit better.

Eric Skonberg 3/17/2006

124

MR. BROWN: Hold on. Hold on. I may actually -- here we go.

BY MR. BROWN:

Q. Just so we can identify, the shaded portion on exhibit -- what we marked as Exhibit 98 is actually red on that original page.

A. Uh-huh. (Affirmative.)

Q. And your little text block is yellow.

A. Yes.

Q. All right. Now, where did you get the data for that 3 joint radius?

A. I got the data from the -- there were two sets of data. And I would have to look to find specifically, but it was data produced -- there were HTI -- Horizontal Technology -- spread sheets that were produced by Sunland.

Q. Okay.

A. And let me see. Give me -- if I may just read up -- I tried to cite where I got the data as I did the report.

Q. Well, let me hand you something which I will tell you comes from Mr. O'Donnell's report. Whether it is the HTI data or his report, he seems to have carefully logically summarized the radius information.

Eric Skonberg 3/17/2006

125

A.    Okay.  This is --

Q.    Have you seen that before?

A.    This was part, I believe, of Mr. O'Donnell's report.  He got this data from the documents that I was telling you about.

Q.    Okay.  I understand that's Mr. O'Donnell's, but have you reviewed it and can we for today's purposes consider that to be accurate?

A.    I think it's reasonable.  I have not gone through it number for number; but when I looked at his charts, they were reasonably close to mine.

Q.    Well, if you go to your Page 8 on your report --

A.    Uh-huh.  (Affirmative.)

Q.    -- it appears that your inclination degrees, your numbers match up with Mr. O'Donnell's chart.

A.    Okay.  I can go through them but if -- that's fine.

Q.    Well, let's, for these purposes, subject to finding out it was wrong, let's mark this and let me use this as the next exhibit, Number 99, I guess, and then we can correct...

Eric Skonberg 3/17/2006

126

(PLF. EXH. 99, a chart entitled Deep Head Swash Stormwater Ocean Outfall, was marked for identification.)

THE WITNESS:  Would you like me to make a statement as to exactly what I looked at to get this data?

MR. BROWN:  Yeah, I would.

BY MR. BROWN:

Q.   Tell me what you looked at.

A.   Okay.

Q.   Go ahead.

A.   I want to go back and look through the materials.  I can't do it off the top of my head.

Q.   Okay.  Go ahead.

A.   Okay.  I need to --

MS. CANNON:  He means a written statement, I think.

THE WITNESS:  I was going to produce it afterwards.

MR. BROWN:  Okay.  That's all right.

MR. SMITH:  You can do whatever you want to do.  Just answer his questions, would be better.

THE WITNESS:  All right.  I apologize for causing any --

MR. BROWN:  That's all right.

Eric Skonberg 3/17/2006

127

THE WITNESS: I'm afraid it would take me some time to sit down and go through their files and find it.

MR. BROWN: All right. You will send me a list of what you looked at and then we can --

THE WITNESS: I've already given you -- it's in the list of what I've looked at.

MR. BROWN: I understand.

THE WITNESS: I was going to try to narrow it down for you.

BY MR. BROWN:

Q. Well, let's use Exhibit 99 for a minute, Mr. O'Donnell's chart.

A. All right.

Q. Now, if I look at your Page 8, your joint number, Azimuth, inclination, dogleg severity --

A. Uh-huh.

Q. -- it appears those numbers are based on 1 joint numbers as opposed to 3 point numbers?

A. The dogleg severity, yes.

Q. At what severity do you believe excessive stresses will be caused?

A. On the drill pipe?

Q. Yes.

Eric Skonberg 3/17/2006

128

A.    I believe I stated that in this report.

There is an API recommended practice, 7G, which I don't have with me.  But somewhere in here I went off of the chart and cited that.

Q.    Can it be calculated?

A.    I believe so, yes.  There's actually a chart in 7G that you can go to and say this is my drill pipe, this is the dogleg severity, anything above this.  And it would be my understanding that that curve is based on calculations.

Q.    Okay.  Well, whatever we say about the stress, we do know that despite the doglegs at joints 7 and 8, Sunland did create a hole, a 64-inch hole, that you believe was sufficient to pull the pipe, correct?

A.    After recovering from the breakage in their drill pipe or their assembly.

Q.    But they did, in fact, produce the hole, maybe over a longer period of time, but they did, in fact, produce the hole, despite the stresses you say were imposed by these joint radii?

A.    That's the conclusion I came to looking at the material.

Q.    And we know that up until -- through the 18-inch through the 52-inch reamer, there were no

Eric Skonberg 3/17/2006

129

difficulties encountered and all of the reams went well.

A.    They were uneventful.

Q.    And the events did not start until we were into the 64-inch reamer.

A.    Well, it actually -- the penetration rates and the higher torques did manifest them somewhat on the previous reaming size, whether that was 52 or 54.

Q.    All right.  Now, joints 7 and 8, where is it in terms of the stations?

A.    And I hate to say it, but this did not print out very well.  It's on here.  It should have printed out.

THE WITNESS:  Do you have another copy?

MR. SMITH:  I don't know.

THE WITNESS:  Okay.  It's on there.  And what I would need to do, coming back to his -- if I -- on the printout it should have joint number so and so.  And you can barely see them.

BY MR. BROWN:

Q.    The joints are 30 feet.

A.    Approximately.

Q.    Okay.  Well, roughly --

A.    You asked me where joint 6 is and I'm

Eric Skonberg 3/17/2006

130

trying to give an answer. If I can use Hugh O'Donnell's calculations, which I have no reason to think are incorrect, he's saying it's at station 1174 which is approximately halfway in here, okay, at an elevation of minus 39.4, which ties up pretty well.

So I would say -- I'm trying to say this out loud so it gets in the record. I would say it's at station 1174, elevation minus 39, approximately right here.

Q. Is that the end of 6 and the beginning of 7?

A. Yes. So as -- well, I cannot say with certainty --

Q. As close as we can get it today, is that approximately --

A. That's approximately where it is.

Q. 1170 is the approximate end of 6 and the beginning of 7.

A. Yes.

Q. Now, what was the radii of 6?

A. Well, Hugh has calculated a 3 point radius. He's calculated a radius and the 3 joint radius.

Q. All right. What's the 1 joint radius?

Eric Skonberg 3/17/2006

131

A.    Hugh has represented it at 3,042 feet, the 1 joint radius.

Q.    What did you say in your report the 1 joint radius was?

A.    I don't believe that I did.

Q.    All right.  What's your dogleg severity?

A.    That's a different expression for curvature than a radius.

Q.    Well, did you have to calculate your radius to come up with the numbers in your report?

A.    No, not for the dogleg severity.

Q.    Well, isn't the radius a function of dogleg -- or a dogleg severity a function of the change in radius?

A.    Yes.  They are both describing the same phenomena.

Q.    Now, when we end 6 and start 7, what is the change in the radius according to his calculations?  It went from what to what?

A.    According to Mr. O'Donnell's calculations?  And we're talking about -- it goes from -- on Joint 6 his calculation is 3,042.  On joint 7 -- and I'm presuming this is a 1 joint radius -- is 703.

Q.    Does the chart say it's a 1 joint

Eric Skonberg 3/17/2006

132

radius?

A.    No.

Q.    Is there a radius and then a 3 joint radius?

A.    Yes.  He has 3 point.

Q.    3 point.

A.    I'm making the assumption that's 3 joints.

Q.    Okay.  Well, is it logical from your experience that the 1 joint radius is the first number?

A.    That would be my first assumption, yes.

Q.    Now, is that a severe change in the path of the drill bit at that point?

A.    The issue -- that's a severe change in the curvature, but I would like to add that that's not the issue that I'm making here.  It's not the change in the curvature.  It's the actual curvature.

Q.    Okay.  Well, I understand -- I'm not necessarily talking about your issue.  I just want to understand what I'm looking at first.

A.    Okay.  That is a much more severe curve than joint 6.

Q.    It meant that the -- if I call it a

drill bit -- cutter head, whatever is creating the pilot hole, correct?  What's creating the pilot hole?

A.    The drill bit.

Q.    The drill bit.  It's going at a certain angle, correct?

A.    Uh-huh.  (Affirmative.)

Q.    There is a severe change in that angle at the approximate end of joint 6.

A.    Over that joint.  I won't say at the end.

Q.    Over that joint.

A.    Over that approximate 30 feet.

Q.    And in which -- there's a plus and a minus -- or there's a minus number and some are not minus numbers.  Does that indicate whether the change was up or down?

A.    We would have to say which -- which number goes negative.

Q.    Well, one of them means that the -- if it's a negative and a not negative, then the bit has gone in different directions.

A.    Well, which numbers?  For instance, if it's a negative in the elevation it means that it's under sea level.  The two pieces of data that we're

Eric Skonberg 3/17/2006

134

looking at are the inclination and the Azimuth.

Q.    No, sir.  I'm looking at the radii.

A.    I don't see any negative number.

Q.    Right here, variance.  What is that?

A.    I don't know.

Q.    You don't know what that is?

A.    I don't know what Hugh was calculating there.

Q.    What would you anticipate it to be?

A.    I don't know.

Q.    All right.  If 6 -- 7 is 703 at a single joint --

A.    Uh-huh.  (Affirmative.)

Q.    -- and the number is 2.55 and then at 8 it's 405 and then it goes to negative 4.45, does that indicate that the change in one place was in one direction and the next place the change went in an opposite direction?

A.    I don't know.  I really would have to look at his calculation methods.  Again, my first assumption would be that he's calculating the total angle change, but he's calling it variance and I don't know --

Q.    If it is total angle change, what we're saying is that the drill point either jumped up or

Eric Skonberg 3/17/2006

135

down in vertical plane, correct?

A.    Or left or right in a horizontal plane. And/or.  It's a combined...

Q.    Now, if I understand it, the cutter head can skip or be thrown off direction if it hits a hard surface, correct?

A.    It could.

Q.    Would that type of sudden change indicate that it hit a hard object which caused it to quickly deviate, significantly deviate off its prior angle?

A.    Off it's prior angle?  It could indicate that the hard material is changing its inclination, on the assumption that it's a flat material that you're hitting.  You're drilling in three dimensions; that's what I'm trying to get across to you.

Q.    Left, right, up, down and forward?

A.    Uh-huh.  (Affirmative.)

Q.    Are those the three dimensions you're talking about?

A.    Forward, backwards.

Q.    But at somewhere a point around the end of drill pipe 6 we see a dramatic sudden change in the angle of the cutter head, correct?

Eric Skonberg 3/17/2006

136

A.    Which angle?

Q.    6 to 7.

A.    Well, the inclination or the Azimuth.

From 6 to 7, the change in the Azimuth was from 136.2 to 131.1.  The Azimuth is your left/right, like a compass.

The change -- and I'm doing my best to read these correctly.

Q.    Okay.

A.    The change in inclination went from 79.75 to 80.68.

What that would tell me is that the majority of the angle change was left to right.

Q.    But we also created a significant change in radii which has to be in the vertical, correct?

A.    You've generated less than one degree in inclination.

Q.    What created the dramatic change from 3,000 to 700 in the radii?

A.    Well, again, I'm assuming that Hugh's calculations take into effect the total angle change.  There are ways to calculate the total angle change combining that and the inclination -- and I'm sorry -- that and the inclination and that with the Azimuth.

Eric Skonberg 3/17/2006

137

You can calculate a total angle change. I'm trying to do this without my hands.

Q. That's all right.

A. And that angle change over that distance is how you calculate the radius.

In answer to your question, the majority of the angle change between joint 6 and joint 7 was in the Azimuth.

Q. You say the dogleg severity, in your report -- let's talk about in your report -- goes from 5.2 degrees to 16.1 and 8 to 28.0.

A. Say that again, please. Yes, sir.

Q. And then after we get to 9, it goes back to 6.9.

A. Yes.

Q. Now, something happened when we ended 6 and went through 7 and 8 that has caused a dramatic change, dramatic in relation to the other numbers, in the path of the driller head.

A. In the dogleg severity.

Q. Yes.

A. Yes. The angles change more.

Q. Could that be the result of the type of material the cutter head is hitting?

A. It could be. But as I was trying to

Eric Skonberg 3/17/2006

138

express, between joint 6 and 7, if you look at the inclination and the Azimuth, the majority of the change between 6 and 7 was in the Azimuth, which is left and right.  Based on my experience, it's not pushing you to one side or the other.  I think that your question was can it make it come up.

Q.    No, my question was can the hard material cause it to skip in some direction.

A.    Hard material can cause it to skip.

Q.    If it hits hard material at an angle, it could skip at the direction of that angle, correct?

A.    If it hits -- yes.  You're talking about the angle of the formation?  If it hits it at the angle of the formation?

Q.    Or if it hits a formation that is angled against the direction of the cutter head, it could skip left or right.

A.    Yeah.  It could.

Q.    Or it could skip up or down.

A.    It could.

Q.    Now, let's put aside Hugh's calculations and let's go back to yours.

A.    Okay.

Q.    Tell me what you did to come up with your 5.2 to 16.1 to 28.0 to 6.9.

Eric Skonberg 3/17/2006

139

A.    Okay.  I took the angles from the document that I'll produce for you, assuming that these were here.

Q.    If we assume that Exhibit 99 is the same information you used, tell me on Exhibit 99 what you used to determine those numbers.

A.    Okay.  I took the change over 30 -- or the drill distance.  You'll notice that on the length -- for instance, between 6 and 7, the length was 31.7 feet, okay?

Using the change in the inclination and the change in the Azimuth, there is a calculation method called minimum curvature that's developed by the American Petroleum Institute.

And -- it's not 7G.  It's -- D20, API D20.

You input the changes in the inclination and the Azimuth.  It will give you a total angle change over 31 feet.

Dogleg severity is not degrees.  It is expressed in degrees per one hundred feet, trying to come up with different distances that you drill.

So that's -- the dogleg severity, degrees per one hundred feet, were based on the API equations of how to do it.

Eric Skonberg 3/17/2006

140

Q.    Now, let me go back to -- your premise is that the severe doglegs are severe changes in the radius which cause changes in the bending of the pipe, correct?

A.    That caused more severe bending of the pipe; yes, sir.

Q.    Which means that the cutter head varied in the distance that these doglegs exist.

A.    Varied in the --

Q.    Meaning that the cutter head had a lot more variation during the -- as it cut through the area of this radius than it had in other areas.

A.    I think -- can you please restate that?

Q.    You are taking the total curve and breaking it up into 34 30-foot sections.

A.    Approximately.

Q.    And then you have a change in angle for each one of those 34 sections.

A.    Yes, sir.

Q.    But then you also have an angle for each one of those 34 sections.

A.    Okay.  Can we go off the record?  I want to do some stuff with my hands.

Q.    Do it on the record because I've got to be able to go through this later.

Eric Skonberg 3/17/2006

141

A.    Okay.    If we can contain our discussion right now to the dogleg severity calculations.

Q.    All right.

A.    Okay.  And my intent in performing the dogleg severity calculations was to allow me, within API guidelines and standards, to understand the stresses on the drill pipe and even partially a conclusion on downhole tools.  Okay?  Simply the dogleg severity.

Q.    Which number is dogleg severity?  Is it in degrees?

A.    It is expressed in degrees per one hundred feet.  Okay?

Q.    Which is basically a 3 joint length.

A.    No.

Q.    1 joint?

A.    It is not calculated over 100 feet.  It is expressed over 100 feet.  Okay?

For instance, if you have a joint that's 33.333 feet long, okay, and you had a total angle change of 1 degree over the 33.333 feet --

Q.    Keep going.

A.    -- then that dogleg severity would be expressed as, over this joint the dogleg severity was 3 degrees per 100 feet.  It's not calculated

Eric Skonberg 3/17/2006

142

over the 100 feet.  It's expressed.

Q.    All right.  Now, I understand that on how you correct.  Let me skip.  Let me jump over to something else.

The radii.  The radii is reflecting something different than dogleg severity; isn't it?

A.    They're both expressing curvature of the drill hole.  The radii that I calculated -- I tried to stay with a calculation of a radius over -- as calculated over three joints.  So in that calculation it was not expressed as three joints. It was calculated over three joints.

Q.    But if I look at drill -- if I look at segment 6 of the radii -- and it has a radii calculated for that 30-foot section; doesn't it?

A.    Hugh has done that.  Mr. O'Donnell has done that.

Q.    What is that number?

A.    Well, just for consistency, let's go from 6 to 7.  All right.  For the drill path between joint 5 and joint 6, what I am assuming is a 1 -- is a radius calculated over one joint of 3,042 feet.  I'm assuming that we're all -- you know, I'm going off of his.

For the joint drilled -- for the drill

Eric Skonberg 3/17/2006

143

path drilled between joint 6 and joint 7, the
calculation is 703 feet.

Q. Now, doesn't that tell me that the
cutter head changed the angle of attack at that
approximate location?

A. Over that drilled length.

Q. And that is a fairly severe change in
angle as compared to all of the other numbers,
correct?

A. I won't say all of the other numbers,
but it is more severe than the majority of the
numbers.

Q. How many numbers are under 1,000?

A. According to Mr. O'Donnell's
calculations, three. I will say five, but I will
even disregard the last, the last joint. One, two,
three, four.

Q. Four out of 33?

A. That's fair.

Q. And the joint 7 and joint 8 are clearly
the tightest radii.

A. According to Mr. O'Donnell's
calculations.

Q. So can't we conclude from looking at his
radii that at the location of joints 7 and 8 the

Eric Skonberg 3/17/2006

144

cutter head varied in its angle of attack and moved
around more than at any other location in the drill
path?

A.   There was more severe curvature through
this section than other parts of the drill path.

Q.   Okay.  The operator was not able to
maintain the same curvature through those two
joints that he maintained through the rest of the
drill path.

A.   I don't know if he was not able to as
opposed to he did not.

Q.   But you don't know the answer to that.

A.   I don't know the answer to that.

Q.   One possibility is that he hit hard
material at an angle that caused the cutter head to
deviate from the intended angle of attack.

A.   That's a possibility.

Q.   Okay.  Do you have sufficient
information to offer an opinion as to the most
probable cause as we sit here today?

A.   No.

Are we going to -- I was wanting to take
a break, but if you want to stay with curvature.

MR. BROWN:  Take a break.  If you need
to take a break, take a break.

Eric Skonberg 3/17/2006

145

THE WITNESS:  Okay.

(A brief recess was held.)

BY MR. BROWN:

Q.    Is the curvature graph discussion intended to illustrate anything other than the difficulties the curvature imposed on someone's ability to drill a hole?

A.    The curvature chart on Page 7 is -- the 3 joint radius --

Q.    Yes.

A.    -- and I believe I've already testified to you that 3 joint radius is an analysis more used for the affect on the pipeline when it's being installed.

Q.    And you used the one joint to determine the effect on the drilling pipe itself.

A.    Yes.

Q.    In reading your sequence, it appears that -- I think the way you described it, it was uneventful until they hit the 64-inch reamer.

A.    That was the conclusion that I came to.

Q.    Do I also read your report correct to say that the drilling problems were principally located at joints 7 and 8?

A.    On the 64-inch ream?

Eric Skonberg 3/17/2006

146

Q.    On any reamer.

A.    Well, if I recall my analysis, looking at torque loads -- and I did look at the smaller diameters, but I didn't include them in the report -- there were not as severe changes in the torque that -- I don't want to say the torque required -- the torque that Sunland encountered through that section.  And I included the torque graphs of the 54-inch -- 64-inch and the 52-inch.  And your question was --

Q.    Were the problems they encountered principally located at joints 7 and 8?

A.    The event -- through this area they encountered higher torques, okay?  And then -- I mean, when -- I guess the term uneventful in late January -- and I would have to recollect the exact day -- was when their drill pipe actually parted or their tool parted.

Q.    At what location?

A.    I don't believe I actually stated in my report.  To the best of my recollection, it was around joint 6, and I would like to verify that or --

Q.    Well, if we didn't have the dogleg severity at joints 7 and 8 and we didn't have the

Eric Skonberg 3/17/2006

147

torque spikes at 7 and 8, would you conclude that there was any operational problem with this curve?

A.    If you didn't have the torque spike, then I would be less concerned about it.

Q.    Well, let's say we take out joints 7 and 8, because the torque spike is at joints 7 and 8, correct?

A.    Predominantly, yes.

Q.    Well, we're going to do this.  This is again Mr. O'Donnell's.  And I don't know if you have looked at that, but let's just mark it.

A.    Okay.

Q.    Is that also a reasonable depiction of the torques?

THE WITNESS:  Does she need to mark it?

MR. BROWN:  Yes.

MR. SMITH:  Everybody's got to stop talking for her to mark it, though.

(PLF. EXH. 100, a document entitled Sunland Drilling, Comparison of Torque, was marked for identification.)

BY MR. BROWN:

Q.    Now, we have marked Mr. O'Donnell's chart of torque readings as Exhibit 100, correct?

A.    Yes, sir.

Eric Skonberg 3/17/2006

148

Q.    Is that chart substantially the same as your chart on Page 11 of your report?

A.    Largely the same.  Without going back into the text of his report, I'm assuming that this is for the reaming passes prior to January 25th, January 30th, that time.

Q.    If we take his chart, the big spike in torque is at 7 and 8, correct?

A.    Uh-huh.  (Affirmative.)

Q.    And on your chart the big spike in torque is at 7 and 8, correct?

A.    Yes, in that area.

Q.    Let's just say we took a pair of scissors and cut it out.  Do you see anything that suggests a drilling problem anywhere else in the curve of the spike path?

A.    Well, there was a spike back near the --

Q.    Exit pit?

A.    The exit pit.  And I believe he shows that.

Q.    Could that have been the 4-foot layer of limestone they were dealing with?

A.    It could have.  But there was also significant curvature through that area.

Eric Skonberg 3/17/2006

149

Q.   How do you differentiate between the two based on the data you have?

A.   In what way?

Q.   Well, how do you say that 1 percent versus 99 percent versus 50 percent is due to curvature versus limestone?

A.   With regard to --

Q.   Can you do that?

Let's say we have an area that we know we have a 4-foot limestone layer and we know we have severe curvature and you get a torque reading, it's high.

Do you have the ability to tell me how much of that was contributed by curvature and how much was contributed by the hardness of the limestone?

A.   No, I don't have a way of calculating that.  In principle I was trying to express that what will affect the increase of torque due to curvature is the load that's behind the reamer, okay, so that load being the drill pipe that's following along behind.

As the reamer is coming into the area near the exit pit, in spite of high curvature, there's very little behind it that's causing it to

Eric Skonberg 3/17/2006

150

pull into the hole, into the wall of the hole.

So I would be more concerned about those sections closer to the drilling rig where there is a string of 800-some-odd feet of drill pipe behind it.

Q.    Let's assume we are drilling through a curve which is within your limits that you say are recommended by API.

A.    That API recommended, yeah.

Q.    Yeah.  You still have some curve to your pipe.

A.    Yes.

Q.    Could you get a high torque spike because you hit very hard limestone?

A.    Yes.  That's possible.

Q.    Torque will be related to the material you're drilling in and how hard you're pulling the pipe, correct?

A.    And the type of cutter that you're using.

Q.    All right.

A.    And there will be some other factors, but those are the...

Q.    All of those factors go to creating the torque.

Eric Skonberg 3/17/2006

151

A.    Yes, and even the drill operator.

Q.    The curvature of the pipe, whether it's acceptable or excessive, is simply one of those factors, correct?

A.    The curvature is one factor.  And I believe listed in the factors that we just went through was the -- or it should have been included -- the load behind the reamer, behind the tool.

Q.    In your opinion, is there any one of those factors that is going to be the one that creates the predominant amount of the torque you're reading?  What's the major producer of torque in the process of pulling the cutter head?

A.    I would say that on a 64-inch cutter, the majority of that would be related to the cutter itself which would be the -- the type of material and the operator, what he's trying to make it do.

Q.    The type of material being what you're cutting through?

A.    Yes.

Q.    All right.

A.    And that's a very general statement.  I think -- if I can add, because I think that what we're talking about is the detrimental effect of --

Eric Skonberg 3/17/2006

152

What I was trying to express was the detrimental effect of the high torque in an area of severe curvature and how that is detrimental to the drill pipe.  Okay?

The analysis -- the spirit of API 7G, that analysis, it does not matter what is causing the torque.  It's simply a function of torque on the drill pipe, the characteristics of the drill pipe itself, and the load in an oil well underneath where you're doing the analysis or the load that would be behind it.

Q.    And what you said is that the curvature may produce fatigue that could produce pipe breakage.

A.    Yes.

Q.    That may delay the job, but it doesn't necessarily prevent the job; does it?

A.    Not necessarily.

Q.    And we know that despite whatever curvature was encountered, the hole did get opened to 64 inches.

A.    That's my understanding; yes, sir.

Q.    But we can also take the same data; and in addition to determining whether or not you're stressing the pipe, we can also infer certain

Eric Skonberg 3/17/2006

153

characteristics about the ground and what happened and what was done during the process of pulling the reamer, correct?

A.    The first part of your question, I understood, had to do with the stresses on the pipe and --

Q.    Forget the stresses on the pipe.

A.    Okay.  Can you repeat the question or rephrase it?

Q.    The data can also tell us about what conditions were encountered when the pipe is being drilled, correct -- when the hole is being drilled?

A.    The torque value is recorded.  I think we've already -- or I've already said that there are several factors that can relate to the torque. And the data that we're talking to is about the torque values.

Q.    Can you testify, as an engineer, to a degree of engineering certainty, that the torque encountered at 7 and 8 was solely the result of the dogleg, excluding all other factors?

A.    No, I can't do that.

Q.    Is it possible that there were other factors that created that spike in the torque in addition to the curvature?

Eric Skonberg 3/17/2006

154

A.    At joints 7 and 8?

Q.    Yes.

A.    Yes, sir.  It is possible.

Q.    Your conclusion is that Sunland was unable to do the -- perform the work because of their own operational difficulties?

A.    As a general statement, yes.

Q.    How do you exclude the possibility of boulders and water under pressure as a cause of Sunland's difficulties?

A.    As a cause?

Q.    Yes.

A.    As opposed to the cause?

Q.    Yes.  Or can you?

A.    I don't think that I can completely without a -- I'm not convinced necessarily that there were boulders in the aquifer.  I think the conclusion in the report had to do with the fact that Sunland is making a claim on differing ground conditions, boulders, and a fresh water aquifer as being the reason they have not installed it.

They had many other problems that even going -- even assuming boulders in a fresh water aquifer would not have affected those problems.

Q.    Well, aren't your problems really

Eric Skonberg 3/17/2006

155

problems that would lengthen the job as opposed to preventing it?

A.    I can say that.  Lengthening, yes.

My experience with HDD is that the longer that you're trying to work with a hole -- to recondition it, to open it -- the higher the chance of not being able to use that hole.  I can't calculate that for you.  So it certainly contributed to it.

For instance, if you were to start over in a new hole, all right, that would extend the job, but it would not -- you know, it would not be impossible.

Q.    Well, my question is, can you, to a reasonable degree of engineering certainty, tell me that water under pressure underground and boulders had no influence on the difficulties that Sunland encountered in this job?

A.    With certainty?

Q.    Yes.

A.    As opposed to an opinion?

Q.    Well, I'm talking about an opinion as opposed to misgivings and possibilities.  I'm talking about the difference between possibilities and the probable cause of the failure.

Eric Skonberg 3/17/2006

156

A.    I don't think that there was one probable cause of the failure.  I don't think that it's that clean cut.

I think that I can say that the boulders, if there were boulders, did not affect the stinger breaking on the barge.  I think that I can say that the fresh water aquifer would not affect a broken crane.

I think I can say that neither the aquifer or the boulders would account for not being able to transition the pipe into the drill hole.

And I can't say that any of those problems, for instance, were the cause of not completing the work, but they were all contributing.

Q.    The stinger -- the crane breaking on the barge is a time issue.  It has nothing to do with the feasibility of the project or whether Sunland was properly running the reamers, does it?

A.    It can effect -- and, again, this is a more subjective opinion, is that the longer the drilled -- a drilled hole stays open, the more likelihood that you're going to have difficulties with that drilled hole.

Q.    Can you -- go ahead.

Eric Skonberg 3/17/2006

157

A.    Okay.  The delays caused by the difficulties offshore -- I think in this case we cited the crane -- contributed to the amount of time that that hole had to remain open.

Q.    It's your opinion that the amount of time the hole stayed open is a cause of the collapse of the hole.

Do you agree that the hole did, in fact, at some point collapse?

A.    I'm not convinced of that.

Q.    Did you dispute it?  Do you have information in which you can, as a matter of engineering judgment, say it never happened?

A.    I don't believe that I ever said that it did not happen.  I think I did put forward that after the breakage of the drill pipe in late January to when Sunland was -- and later in February again attempting to pull the hole back, the cleaning of the hole, the running through of the cutters and the reamers, the conditioning of the hole again was uneventful, which would indicate to me that the hole was likely ready for a pull-back and not caved in.

Now, in terms of it ever being caved in, the only -- from looking at the materials, the

Eric Skonberg 3/17/2006

158

second time that the drill pipe broke was in March, mid March.

Q.    Where did it break?

A.    Where did it break?

Q.    Yeah.

A.    Approximately five joints from entry. This was from Jimmy Reynolds' diary.

Q.    Okay.

A.    And that at the time of failure, Jimmy Reynolds noted that there was very little push and torque.  And that was from Sunland 1618.

Q.    All right.  Let me ask you this:  We know that matters proceeded very well up through, let's say, January, what did we say, 25?

A.    They were uneventful.

Q.    Uneventful.  They were on time, correct?

A.    They seemed to be generally on time; yes, sir.

Q.    From on or about that time through the time they were terminated, there were difficulties, correct?

A.    Yes.

Q.    Can you, based on your review, tell me, as a matter of engineering opinion, that there was no contribution whatsoever by underground water to

Eric Skonberg 3/17/2006

159

those difficulties?

A.   I cannot tell you unequivocally that there were no boulders and that there was not an aquifer.  I can tell you it's my opinion that there were not to the extent described.  But I cannot say -- I cannot make the statement that I think that you were trying to --

Q.   Let me ask you this question.

A.   -- that there was no chance.

Q.   If there was water under pressure underground that was of sufficient pressure, would that be a cause of the difficulties encountered by Sunland?

A.   It could be one difficulty.  It would not have been a cause of all of their difficulties.

Q.   I understand it didn't cause the crane on the barge to break.

A.   That would be my conclusion.

Q.   But wouldn't it cause difficulty in keeping the hole open?

A.   To my knowledge, they didn't have a problem keeping the hole open through most of February.

Q.   But just in terms of HDD principles, isn't it accepted that flowing water can cause a

Eric Skonberg 3/17/2006

160

problem with keeping the hole open?

A.   It can.  Can you tell me when was the hole caved in?

Q.   Well, I'm asking you.  Do you believe or is it your opinion that that event never happened?

A.   It's my opinion that I'm not convinced that it did happen.

MR. BROWN:  Does anybody happen to know where the Golder report was identified?

MR. SMITH:  It was made an exhibit. Let's see what number it was.  93.  I've got a copy right there.

MR. BROWN:  All right.

THE WITNESS:  You gather all of these up at the end, right?

MR. BROWN:  She does.

THE WITNESS:  Okay.

BY MR. BROWN:

Q.   Just for purposes -- in the Golder report there's a photograph, Figure 2, a color photograph of boulders.  I think we're at the same place, 3/21/2005.

A.   Uh-huh.  (Affirmative.)

Q.   Would you call those boulders?

A.   I would call them -- I don't know them

Eric Skonberg 3/17/2006

161

to be boulders.

Q.    What's the definition of a boulder on the scale you referred to?

A.    Well, I'm not a geologist or a geotechnical engineer.  This may well be rock that was broken.  Boulders -- my understanding would be the in situ size of the material.

Q.    Okay.

A.    What I'm seeing here -- I'm seeing materials that if this was found just like this, they would be of a size that would be called a boulder.

Q.    Okay.  They clearly are bigger than ten inches, correct?

A.    Yes.

Q.    Looking at the man beside them, there are some that may be four or five feet long.

A.    They're a good size.

Q.    Now, do you dispute that these boulders were taken out of the drill path?

A.    I don't know that.  It's my understanding that these were taken out during the excavation to the drill path.

Q.    Can you deny that these boulders came from the drill path at some location?

Eric Skonberg 3/17/2006

162

A.    No.

Q.    If these boulders existed as you see them in this picture, wouldn't that be a differing site condition based upon what you see in the geotechnical report?

A.    The only difference would be if the drilling itself broke these up.

Q.    Let's assume the drilling itself didn't break these up and these are boulders that existed in the drill path and are not the result of the break-up of layers.

A.    Caused by drilling.

Q.    Yes.  Wouldn't that be a differing site condition?

A.    Yeah.  I would not expect to see this. Yes.

Q.    Now, is it your testimony that these were pieces of rock -- are the result of the break-up of nine-inch layers?

A.    I don't believe I've given any testimony other than what we've just talked about right now.

Q.    Do you have an opinion on whether or not these pieces of rock in this picture, the 3/21/05 with the man standing next to it, is it your opinion that these pieces of rock or limestone are

Eric Skonberg 3/17/2006

163

the result of the break-up of a nine-inch layer of limestone?

A.    I don't know that.  I don't know what these came from.  I would not -- it's not my testimony that it came from nine inch or didn't come from nine inch.  I would not expect to see that from a nine-inch layer of cemented sandstone or limestone.

Q.    Can you today give me an opinion that these rocks in this picture did, in fact, come from the break-up of the nine-inch layers of limestone identified in the geotechnical report?

A.    I cannot testify to that.

Q.    Wouldn't you expect as a matter of experience that these rocks did not come from the break-up of a nine-inch layer of limestone?

A.    Not from a nine-inch layer of limestone, but possibly a thicker layer.

Q.    Is it your opinion that these rocks came from the entry point, from the exit point out in the ocean?

A.    Is it my opinion?

Q.    Yes.

A.    My understanding of this photograph was -- and I don't know where I got it, so it may

Eric Skonberg 3/17/2006

164

very well be wrong -- was that this was from the excavation at the shoreline.

Q.    Okay.  You understand that all of these rocks were dug up at the shoreline and were in the ground in the drill path.

A.    That may very well be my assumption and it may be wrong.

Q.    Can you dispute that assumption based on any information you're aware of?

A.    Can I dispute that assumption.

Q.    Based on information that you're aware of in this file.

A.    Can you dispute it?

Q.    I don't get to testify.

A.    Well, wait a minute.  You're wanting me to dispute my own assumption?

Q.    No.  I'm asking you, if someone testifies that these rocks were dug up at the shoreline, all in one place, do you have information to dispute that that is, in fact, true?

A.    No.  I cannot dispute that based on the materials that I've looked at.

Q.    If rocks of that size were preexisting in the drill path, would that cause problems with Sunland executing the work and keeping the drill

Eric Skonberg 3/17/2006

165

path open?

A.    They could, yes.

Q.    You've given certain opinions about the contract itself and the information contained in the contract, correct?

A.    Yes, sir.

Q.    You commented on the "no hole no pay" clause, I believe.

A.    Yes.

Q.    That's on Page 3 of your report, 1(d).

A.    Yes.

Q.    Your sentence says, "In my opinion, this provision with the absence of a formal Differing Site Conditions clause indicates that the contractor assumes all risk."

A.    For differing site conditions.

Q.    Okay.  If a "no hole no pay" clause is in the contract with a differing site conditions clause, then would you agree that the risk does not shift to the contractor?

A.    Assuming -- well, it depends on what the differing site condition clause says.  But if the differing site conditions clause alleviates the contractor of that liability, potential liability, then, yes.  I would say yes.

Eric Skonberg 3/17/2006

166

Q.   Okay.   You don't have to have the magic words Different Site Conditions clause for that clause to be effective to alleviate the contractor, correct?

A.   And I want to be clear that we're communicating.

Q.   Yes, sir.

A.   A differing site conditions clause -- and I've seen many different kinds -- some will -- and, again, I'm not an attorney, but my interpretation is in this industry.

I have seen site conditions clauses that says here is the soil data; if there are any alleged changes or differing site conditions, we're not going to pay the contractor any more.  That's a differing site conditions clause.

There are other clauses more like the federal clause where it's much more in favor of the contractor.

So I guess if we're discussing a differing site conditions clause, maybe we should just leave it a differing site conditions clause that is in favor of the contractor.

Q.   Okay.   There are no magic words to it. I mean, you don't have to say differing site

Eric Skonberg 3/17/2006

167

conditions clause so long as you have expressed the intent that the risk is not on the contractor.

A.    You've expressed the intent of the parties.

Q.    And if that intent is that the contractor is not responsible for differing site conditions, then the "no hole no pay" does not shift the risk to the contractor.

A.    In my -- I don't believe I agree with what you're saying.  I think that contradicts what I'm saying right here.

If there is -- as an HDD contractor, okay, in my opinion, this is one of the more important parts of the contract that one would look at, a differing site conditions clause, okay, because that clause can be very much in your favor as a contractor or against you as a contractor. And the commercial risk that goes with it.

If there was no clause in the contract relating to differing site conditions and there was the term "no-hole-no-pay", then my opinion is that in the absence of a formal differing site conditions clause, then the contractor assumes the risk.

Q.    All right.  Now, if we have "no hole no

Eric Skonberg 3/17/2006

168

pay," but we have language that addresses the circumstance of the physical conditions on site being different than expressed in the contract documents, or do we then have another circumstance?

A.   I think I would want to -- I would want to see specific -- the specific wording.  For instance, are you alluding to the errors and omissions clause?

Q.   Yes.

A.   And I haven't read that in a while.  I mean, for instance, I don't see errors and omissions as -- I see that as a different issue than differing ground conditions.

Q.   Well, do you think the title in and of itself governs it or do you think the actual wording of the sentences that follow the title are what is more important?

A.   Both.

Q.   If the sentences that follow say --

A.   If I can, I'm not an attorney.  I don't know case law on all of this.  I'm giving you testimony based on my interpretation of looking at these agreements and advice I may have received over the years.

Q.   Are you planning on offering an opinion

Eric Skonberg 3/17/2006

169

that the language following the errors and
omissions clause does or does not affect the risk
shifting in the contract?

A.    I would want to review that again before
I would make that statement.

Q.    All right.  Let's review it because I'm
going to have to -- I need to get my answer today.

A.    Okay.  Can you pull it out for me?

MR. SMITH:  It should be Exhibit 5, I
believe.

MR. BROWN:  Yeah.

THE WITNESS:  Okay.  Could you ask it
again, please.

BY MR. BROWN:

Q.    My question is -- let me go back and
make sure I understand.

Your opinion that the risk was shifted
to the contractor for unknown site conditions is
based upon the existence of "no hole no pay" and no
effective differing site conditions clause that
relieves the contractor.

A.    The absence of a differing...

Q.    And we can assume by that that if there
is an effective differing site conditions clause or
some other clause by another name that tells the

Eric Skonberg 3/17/2006

170

contractor he's not responsible for differing site conditions, then the "no hole no pay" does not shift the risk.

A.    If there is another clause that specifically states that the shift is not -- that the liability is not shifted to the contractor?

Q.    Yes.  Then the "no hole no pay" in combination with that sentence does not shift the risk to the contractor.

A.    I can agree with that in principle.

Q.    All right.  Now, under errors and omissions, regardless of what we call it, the sentence, second sentence -- comma, or -- do you see that?

A.    Yes.

Q.    "If he..."

He means the contractor, right?

A.    Yes.

Q.    "...finds any discrepancy between the contract documents..."

Contract documents in this case include the geotechnical report, correct?

A.    I agree with that.

Q.    "...and physical conditions of the worksite..."

Eric Skonberg 3/17/2006

171

Do you see that?

A.    Yes, sir.

Q.    The worksite in this case is underground, correct?

A.    Part of the worksite is underground, yes.

Q.    And the physical conditions underground would be included within physical conditions of the worksite, correct?

A.    Yes.

Q.    "If he finds a difference between the contract documents and physical conditions of the worksite..."

Which we can read to mean physical conditions underground, correct?

A.    Yes.

Q.    "...he shall immediately notify the engineer in writing for correction."

All right?  Do you see that?

A.    Yes, that's what it reads.

Q.    "If he does work after such discovery, until authorized, any work done after such discovery until authorized will be done at the contractor's risk."

Correct?

Eric Skonberg 3/17/2006

172

A.    That's what it reads, yes.

Q.    Now, doesn't that say to the contractor very clearly that if you find a differing site condition, notify the engineer for correction and don't do any work until you receive authorization?

A.    It does not say don't do any work.  It says that any work -- I will read it exactly.

"Any work done after such discovery until authorized will be done at the contractor's risk."

Q.    Well, doesn't that clearly mean that once he is authorized to proceed after correction it is not at his risk?

A.    If it is done with the authorization?

Q.    Yes.

A.    I don't read it that way.

Q.    What does it mean to notify the engineer in writing for correction?

A.    Well, for instance, if there was a difference in the length drilled, the contractor -- the document said I want you to come out here and it ended up being 1300 feet instead of 1000 feet, all right, that's a call for a correction.

Q.    No, sir.  I'm talking about the phrase, "discrepancy between the contract documents and

Eric Skonberg 3/17/2006

173

physical conditions of the work."

I'm talking about the correction of that condition.

A.    The correction of the ground conditions?

Q.    Yes, sir.

A.    Well, first off, they have to notify the engineer in writing.

Q.    All right.

A.    Okay.  Typical of a differing site conditions clause, as opposed to an errors and -- this -- this clause -- there is a mechanism as to who -- who provides the proof of a differing site condition, differing ground condition.

Q.    All right.

A.    Okay?  This does not say who is to perform the analysis that a correction is to be made.

Q.    I understand that you think that procedures are omitted.  A very simple point, though.

Doesn't this clause say to the contractor that if you find differences between the geotechnical report and what you find underground, notify the engineer and the engineer's

Eric Skonberg 3/17/2006

174

responsibility is to correct it?

A.    Is to correct it?

Q.    Correct it.  Make a change, give direction, give compensation, do something to remedy the difference.

A.    If it is clear to all parties that there is indeed a differing condition, based on your statement, based on the fact that all parties agree to a differing condition, then the engineer has a responsibility to be involved in giving direction.

Q.    And therefore it is not the contractor's risk, correct?

A.    From what point in time?  It doesn't say.

Q.    Well, in the point in time of the discovery of the condition.

A.    As to all the risk for monies expended up to that time or the monies expended after that time?

Q.    The risk of the consequences of the differing site condition lies with the engineer and the owner upon discovery and notice, correct?

A.    Being duly proven.

Q.    Yes.

A.    I disagree with that based on just this

Eric Skonberg 3/17/2006

175

wording. I could not come to the definitive statement that you have.

Q. Now, can you show me any sentence that says specifically it is the contractor's risk for unknown differing site conditions?

A. I don't recall seeing that in this document.

Q. Isn't this the closest we've got to the owner and the contractor addressing what happens when you find a differing site condition? Correct?

A. I can't necessarily agree to that either. I would want to take the time and go back and look. But I know that there may have been words that the accuracy of the information shown in the geotechnical report only related to that location. There's wording for the contractor to get additional information if he needs it.

So there are other somewhat conflicting --

Q. Yes, sir.

A. -- provisions as to whose responsibility it is.

Q. There are conflicting provisions, correct? Doesn't the contract contradict itself at different places about whose responsibility it is

Eric Skonberg 3/17/2006

176

for the geotechnical report?

A.    Well, I disagree -- I don't think that each one of these -- for instance, I understand your statement about -- I understand -- I'm trying to phrase this as an answer as opposed to a question.

In my opinion, the errors and omissions clause is not conclusive about shifting risk.

Q.    Does it at least address it?

A.    For differing site conditions?

Q.    Yes.

A.    I would say for differing physical conditions, it addresses that.

Q.    Now, isn't the existence of boulders, assuming they were there, isn't that a different differing physical condition?

A.    Assuming that they were there.

Q.    Okay.    But this clause does address that possibility.

A.    It could be interpreted that way.

Q.    All right.    You would prefer to interpret it another way, I assume.

A.    I'm not trying to prefer anything. Based on my experience or my interpretation of this -- and I'm not an attorney -- I would want

Eric Skonberg 3/17/2006

177

something much more clearer as part of an agreement.

Q.   Okay.  We can all agree that clarity will avoid a lot of problems.  But if it was your money and you're the contractor and this is your clause, would you have any problem at all telling the owner that I'm not responsible for differing site conditions?

A.   Would I have a problem saying that?

Q.   Would you feel comfortable in telling the owner -- if it's your money -- that based on this clause, I'm not responsible for differing site conditions?

A.   Well, I certainly understand the need to put forth an argument on my behalf, and I would understand somebody grasping this clause.

As a third-party observer and possibly even as the hypothetical of me being a contractor, I'm not sure that I would be convinced of my argument.

Q.   Okay.  And you would gladly absorb all of the losses and walk away?

A.   Certainly not gladly.  I can answer that question.

Q.   And in terms of "no hole no pay," is

there any other information you've looked at, relied upon or that you deal with, factor in, to arrive at your conclusion that in some way this contract had shifted the risk of unknown site conditions to the contractor?

A.    I think in general -- and, again, these are not ironclad -- but it would be any of the disclaimers over interpretations of the geotechnical conditions, the suggestion that the contractor can go get additional information, although my previous testimony is that's not normal in the course of work.  But I think that the spirit of those certainly is to shift it back to the contractor.

Q.    I noticed in your report you made no reference to what was in the first addendum to the contract.

A.    What's the first addendum?

Q.    Well, did you evaluate it?

A.    Well, I need to -- if I can look at it.

THE WITNESS:  Do you know what it is?

MR. SMITH:  Yeah.  It's not that exhibit.  I can't remember which one it is.

MS. CANNON:  7?

MR. SMITH:  It's Exhibit 64.

Eric Skonberg 3/17/2006

179

THE WITNESS: I have gone through my coffee and my water. While you're looking, may I step out?

MR. BROWN: Certainly.

(A brief recess was held.)

BY MR. BROWN:

Q. I think the Addendum 1 I'm referring to is October 20th.

A. This is what I'm looking at, which says October 20th. It appears to be the same.

Q. All right. Run over to Page 3 of 6. Item 5 addresses the soils reports. Do you see that?

A. Yes, sir.

Q. I did not see in your report where you considered that statement.

A. I don't discount that. I've -- I don't -- I don't recall making the statement in my report. I have looked at this document.

Q. Well, shouldn't that statement also be considered in conjunction with all of the other statements in terms of interpreting the intent of the contract documents?

A. I think it's reasonable to say that.

Q. Doesn't the -- these clarifications are

Eric Skonberg 3/17/2006

180

provided to clarify but not change the intent of the contract documents?

A.    To clarify the contract documents, yes.

Q.    And this is the last pronouncement that the engineer and owner has made to the contractor about the intent of the contract documents regarding soil reports.

A.    I will take your word.

Q.    Is that a fair characterization?

A.    I don't know if it's the last, but it's outside of the -- it's an addendum to the tender documents that were sent out.

Q.    And in order to fairly evaluate the intent of the contract documents, we have to include this Addendum 5, don't we?

A.    It could be included, yes.

Q.    Well, it would be inappropriate to omit it; wouldn't it?

A.    Yes.

Q.    In Mr. Gamble's deposition -- Mr. Gamble of Wilbur Smith had in his file a document that he said he referred to in his engineering work regarding this project, which is Guidelines for a Successful Directional Crossing Bid Package.  It's from the -- it appears to be one of the industry

Eric Skonberg 3/17/2006

181

organizations.

A.    Right.

Q.    Are you familiar with that?

A.    Yes.

Q.    You were actually part of the committee that prepared it?

A.    I think I was chairman.  This is from the Directional Crossing Contractors Association.

Q.    Yes.

A.    Actually, this didn't list me as chairman, but I recall being chairman of the committee.

Q.    Well, that document is Exhibit 44 to Mr. Gamble's deposition.  That is work product that you at least had a significant role in preparing.

A.    I would say I had a role in preparing it.  Just by being on the committee, I would say significant.  I would say that producing a document by committee, it's not necessarily my work product.

Q.    But when it came out, did it express your views, whether it was your work product or not?

A.    It expressed my views in principle.

Q.    And is it a general statement of your understanding of HDD policies and procedures?

Eric Skonberg 3/17/2006

182

A.    It's not my understanding in terms of policies and procedures.

This document was produced as to be a tool for engineers and owners to produce what we as contractors deem to be an appropriate tender package.  And it certainly expressed guidelines of information that contractors were looking for.

Q.    It was your organization's expression of what you considered to be a good way to bid and prepare HDD projects.

A.    It was the organization's, yes.

Q.    What do you disagree with?

A.    No.  It's -- it's not as simple as black and white.  In principle I agree with what's in that document.  How it relates to any specific issues, I think we should discuss.

Q.    Well, I'm not trying to take it into specifics.  I'm just trying to get the general understanding right now.

A.    Okay.

Q.    Understanding that everything has got to be factored into specifics, is there any reason that Mr. Gamble as an engineer was wrong in relying upon this to understand the general principles related to an HDD project?

Eric Skonberg 3/17/2006

183

A.   No.  I would find that document to be a useful guideline.

Q.   Now, in your opinion, was there any -- would you call what was noted in the geotechnical report rock on this specific project?

A.   Would I call it rock?

Q.   Yes.

A.   Yes, as a driller.  Again, not as a geotechnical engineer.

Q.   As an HDD contractor, you would call it rock.

A.   Yes.

Q.   All right.  Now, in this Exhibit 44 you have a statement of what you do if you encounter rock during the soils investigation.

A.   Yeah.

Q.   What does it say that the -- what should be done if rock is encountered?

A.   If the rock is encountered during the soils investigation borings, it is important to determine the type, relative hardness and unconfined compressive strength.  And it goes on to state some other things.

It is important to know the rock.  For instance, granite drills very different than a

Eric Skonberg 3/17/2006

184

sandstone.

And so, yes, it's important to have this information.

Q.    Other than the statement limestone, did the geotechnical report in this case do anything to fulfill the suggestions that are included in Exhibit 44?

A.    I believe that they attempted to.  My recollection of the soil borings was that they'd actually tried to recover the samples of hard material but were unable to.

Q.    All right.  When they failed to recover them, should they have continued their effort until they recovered a sample that would be useful in the context of what you've described in that paragraph?

A.    It would have been helpful.  I'm not sure -- and, again, you're outside of my expertise. I'm not sure they would have been able to recover samples in an expedient manner.

Q.    But as an HDD contractor, you would have expected that to be provided to you if rock was encountered.

A.    I would liked to have seen that information.

Q.    As you read this contract, was Sunland

Eric Skonberg 3/17/2006

185

bound to the risks identified in the geotechnical report?

A.    That's the conclusion that I came to, the opinion that I came to, that Sunland assumed the liability of the ground conditions encountered.

Q.    To the extent identified in the report.

A.    It was my opinion, as encountered.

Q.    And is that based on the "no hole no pay"?

A.    And the absence of a specific differing site conditions clause.

Q.    But if someone were to conclude that that was a differing site conditions clause, then your opinion would change?

A.    It could change.

MR. BROWN:  Bear with me one minute.

BY MR. BROWN:

Q.    Do you know Mr. Garrett, L.D. Garrett?

A.    Yeah.

Q.    Do you have an opinion about his qualifications as an HDD --

A.    He's a good engineer, reputable.  He has plenty of experience.  I've worked with him on other committees.

Q.    What about Sunland?  Do you have an

Eric Skonberg 3/17/2006

186

opinion about their general reputation or their abilities to perform HDD work?

A.  I think they're a competent contractor.

Q.  Would you have had any reason to recommend against them for the award of this contract?

A.  No.

Q.  Have you made any evaluation of the work done by Coastal Engineering in this project?

A.  I've reviewed -- I've reviewed documents between them and Wilbur Smith.  And your question was have I reviewed anything or have I --

Q.  Have you reviewed the documents and are you prepared to offer any opinions about the quality of their work or whether their work had any affect on the difficulties encountered?

A.  I can give an opinion -- my general conclusion in going through the documents, it was -- I couldn't exactly see where their responsibilities stopped and started.  I know it was primarily with the HDD.  I know they brought on John Hair.

And so I found -- the overall impression I got was that it was a reasonably -- a reasonable engineering package for a project of this type.

Eric Skonberg 3/17/2006

187

Q.    Have you reviewed the extent of Wilbur Smith's qualifications or experience in regard to HDD?

A.    No, other than in the documents and/or testimony, but I have not looked at specific projects they've done.

Q.    What level of qualification would you consider an engineer to need in order to take responsibility for this specific project?

A.    The ultimate responsibility?

Q.    Yes, sir, on site, hands on, I'm making the decisions, I'm making the calls.

A.    I mean, as an engineer?

Q.    Yes.

A.    Okay.  As the engineer, it would depend on what qualified people or organizations that I could bring into the project.  And in that case, I find the team of Wilbur Smith and Coastal Science and John Hair competent and capable.

Q.    Taking Coastal and John Hair out of it, based on what you know about Wilbur Smith's abilities or background and experience -- let's take out abilities.

If we assumed that they had never done an HDD project before and we do not have Coastal or

Eric Skonberg 3/17/2006

188

John Hair around --

A.    Throughout any part of the project.

Q.    -- throughout any part of the project, would you think it would be prudent for Wilbur Smith to undertake the design and management of this project?

A.    Certainly not the design.  The management, I would be less definitive on.  I think that once the contract is awarded, the methods and means fall more to the contractor in a lump-sum arrangement such as this and the engineer is not giving direction as to the construction operations.

Q.    Do you think an engineer who has no background or experience in HDD and who did not do the original -- let's take this situation.

You understand Wilbur Smith brought in Coastal and John Hair and they did the actual design work, correct?

A.    It's my understanding, yes.

Q.    So Wilbur Smith did not hands on participate in the design or investigation of the project, they subbed it to Coastal and then John Hair.

A.    It's my understanding that the design profile was the work product of Coastal and John

Eric Skonberg 3/17/2006

189

Hair.

Q.    Do you think it is prudent for an engineer who has not had any prior HDD experience and who has not been involved in the preparation of the design to undertake by itself the administration of this contract?

A.    I don't find it inappropriate.

Q.    Do you find it inappropriate for the engineer to pass judgment on the quality or sufficiency of Sunland's efforts without any prior HDD experience?

A.    I think it depends on what the judgments are on.

For instance, the operations on the marine barge, I think that they would be qualified to know whether a crane breaks down or is in generally good repair.  Those types of things I would find them qualified.

Q.    What about the techniques, sequence and methodology used by Sunland to drill the hole?  Do you think someone should have HDD experience before they pass judgment on Sunland's methodology and work product?

A.    I think they should have HDD experience, but I don't think that it's absolutely critical.

Eric Skonberg 3/17/2006

190

Q.    Is it critical to the person who is getting terminated?

A.    I think it's critical to the person getting terminated that who you're dealing with can understand your problems.

Q.    Was Sunland entitled to a fair, impartial assessment of their work and the events on this job prior to being terminated?

A.    In principle, Wilbur Smith gave Sunland two cure notices.  And specifically I remember in the cure notices it had to do with equipment breakdowns and delays related to the offshore spread.  I think Sunland had a responsibility to answer those in writing, according to the mechanism of the contract; and if they were not to respond to that, that that can lead to the termination decision.

Q.    That's not my question.

Before you get to the merits, was it Wilbur Smith's obligation as the construction administrator to evaluate those merits, whatever they were, in a fair and impartial manner?

A.    Yes.

Q.    Can you be fair and impartial if you do not have the ability to evaluate the merits of what

Eric Skonberg 3/17/2006

191

Sunland did and how they managed the job?

MR. SMITH:  Object to the form.

THE WITNESS:  Do I --

BY MR. BROWN:

Q.    You can answer.

A.    Okay.  Can you repeat it, please?  He broke my train of thought.

Q.    That's all right.  I can pass on by that.

Have you, in your experience as an HDD contractor, ever encountered and found that you were drilling in an old ancient river bed?

A.    Yes.

Q.    Did you encounter any peculiarities when that happened?

A.    I guess I would need a better definition of an old ancient river bed.

Q.    An old river bed that was in existence thousands to millions of years ago that's been filled up by sediment.

A.    I mean, it's very common, for instance, with river crossings, rivers tend to meander, so you're drilling through the sediments of old rivers.

Q.    Are there peculiar problems associated

Eric Skonberg 3/17/2006

192

with old river beds in regard to gravel or lag or boulders?

A.    Not necessarily.

Q.    But can there be?

A.    There can be.

Q.    If you were in an old river bed, would you recommend to the geotech, as the HDD contractor, that they pay special attention to subsoil condition?

A.    I would say that that should be a consideration.

Q.    Is it your experience, is it common for old river beds to have problems that are unique and different from undisturbed ground that is not an old river bed?

A.    Problems that are unique?

Q.    Do you find peculiarities in old river beds that aren't expected to exist in other ground that has not in the past been a river bed?

A.    You may.  But old river beds and drilling in eluvial plains -- and by eluvial plains I mean where it's been deposited by rivers -- is so common in the HDD industry that it's hard to say that it's a specific peculiarity.

Q.    I'm not talking about HDD drilling.  I'm

Eric Skonberg 3/17/2006

talking about the prospect of finding peculiarities underground.

A.   I would say that you're more likely to find geotechnical conditions that are less homogenous.

Q.   In an old river bed?

A.   In an old river bed.

Q.   Okay.  Homogenous meaning the same --

A.   Remaining the same.

Q.   -- from boring to boring?

A.   Yes.

MR. BROWN:  I think that's all I've got for right now.  If you'll answer any other questions.

MS. PEACE:  I don't have any questions.

EXAMINATION

BY MS. CANNON:

Q.   Do you have any understanding of whether CS&E was involved in the administration of this project when it was the HDD?

A.   It's my understanding that they weren't. And I can't cite exactly how I have come to that conclusion.  It's my understanding that they weren't.

Q.   That's it.  Thank you.

Eric Skonberg 3/17/2006

194

MR. BROWN:  Done.

(The deposition concluded at 3:24 p.m.)

195

CERTIFICATE OF REPORTER

I, Susan M. Valsecchi, Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this **23rd** day of, **March** 2006, at Columbia, Richland County, South Carolina.

Susan M. Valsecchi,
RPR, Notary Public,
State of South Carolina at
Large.
My Commission expires
January 4, 2015

Eric Skonberg 3/17/2006

196

SIGNATURE OF DEPONENT

I, the undersigned, ERIC R. SKONBERG, P.E., do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE/LINE                    CHANGE                    REASON

*Please refer to the attached sheet*

ERIC R. SKONBERG, P.E.    26 April 2006

www.compuscriptsinc.com

<u>Amendments to Testimony</u>

<u>Page 11 Line 18</u> – Amend "diven" to "drilling"

<u>Page 34 Line 4</u> – On further review, I estimate the number of crossing installed while I was at BERCO to be approximately 25.

<u>Page 34 Line 9</u>
<u>Pge 37 Line 20</u>
<u>Page 50 Line 20</u>
<u>Pge 52 Line 4</u>
_ – In each query about change of employment, it should be added that each change was based on a variety of commercial, professional and personal reasons.

<u>Page 126 Line 4</u> – The data used for my calculations were the HTI "Computed Survey Report" (HT 0034 and 0035).

<u>Page 180 Line 15</u> – "Addendum 5" should be "Addendum 1"

<u>Page 192 Line 21</u> – "eluvial" should be "alluvial"

*Eric R. Stanley*

26 April 2006

Eric Skonberg 3/17/2006

197

I N D E X

                                                    PAGE
STIPULATION                                           3


EXAMINATION
          BY MR. BROWN                                 3
          BY MS. CANNON                              193


CERTIFICATE OF REPORTER                              195
SIGNATURE OF DEPONENT                                196



            E X H I B I T S
DEPOSITION                                          PAGE
98.    Defendant's Expert Report of Findings,
       by Eric R. Skonberg, P.E.                      22

98-A.  Appendix 3, As-Built Drill Path
       Data Provided by Sunland Construction
       Company                                        27

99.    A chart entitled Deep Head Swash
       Stormwater Ocean Outfall                      126

100.   A document entitled Sunland Drilling,
       Comparison of Torque                          147